**AUSCAPE INTERNATIONAL,
et al., Plaintiffs,**

v.

**NATIONAL GEOGRAPHIC SOCIETY,
et al., Defendants.**

**No. 02 Civ.6441 LAK.**

United States District Court,
S.D. New York.

Aug. 12, 2004.

Surjit P. Soni, the Soni Law Firm, for Plaintiffs.

Robert G. Sugarman, Pierre M. Davis, Denise Alvarez, Weil, Gotshal & Manges LLP, for Defendants National Geographic Society, National Geographic Holdings, Inc., National Geographic Ventures, National Geographic Interactive, National Geographic Enterprises, Inc., Image Collection and Image Sales, and Mindscape, Inc.

Terrence B. Adamson, National Geographic Society, for Defendants National Geographic Society, National Geographic Holdings, and National Geographic Enterprises, Inc.

Juli Wilson Marshall, Daniel Scott Schecter, Elizabeth Heering Hickey, Latham & Watkins LLP, for Defendants ProQuest Company and ProQuest Information and Learning Company.

## MEMORANDUM OPINION

KAPLAN, District Judge.

In *Faulkner v. National Geographic So-*

*ciety*,[1] this Court held that a CD–ROM archive of digitized images of *National Geographic Magazine* (the *"Magazine"*), known as *The Complete National Geographic* ("CNG"), was a "revision" of the print publication within the meaning of Section 201(c) of the Copyright Act of 1976[2] and therefore did not infringe any copyrights held by freelance photographers and writers whose works first were published, with their consent, in the *Magazine*.

Plaintiffs in this case make the same claims rejected in *Faulkner*. But they assert also that their claimed copyrights were infringed by use of their works·in both microform and electronic editions of the *Magazine* and that the defendants violated the Lanham Act in connection with the CNG and microform products.

Now before the Court are cross-motions for summary judgment, one each by plaintiffs, the National Geographic defendants, and the ProQuest defendants, as well as defendants' motion to strike the expert designation and expert report of John A. Bunge and the ProQuest defendants' motion to preclude certain evidence. As the Court grants defendants' motions for summary judgment dismissing the complaint in almost all respects, there is no need to reach the remainder of the motions.

### Facts

The greater part of the factual background is set forth in *Faulkner*, familiarity with which is assumed. A few words are appropriate, however, in light of the copyright infringement claims concerning the microform editions of the *Magazine* and the two electronic databases, General Periodicals On Disc and its subset, Magazine Express (collectively, "GPO"), as well as the Lanham Act count relating to the CNG and microform products.[3]

ProQuest Information and Learning Company ("PQIL") is a subsidiary of the ProQuest Company.[4] Pursuant to licensing agreements with the NGS, PQIL has reproduced and distributed editions of the *Magazine* in both microform and electronic format.[5] The microform products include microfilm and microfiche reproductions of issues of the *Magazine* from 1888 through the present.[6] Beginning in 1992, PQIL included the 1988 to 1993 issues of the *Magazine* as part of its GPO subscription offering.[7] The GPO products are described more fully in *New York Times Co. v. Tasini*,[8] and there is no need to repeat that description here.

1. 294 F.Supp.2d 523 (S.D.N.Y.2003).

2. 17 U.S.C. § 201(c).

3. The ProQuest defendants correctly note that the Amended Complaint does not explicitly identify the GPO databases as infringing products. ProQuest Mem. in Support of Summary Judgment ("ProQuest Mem.") 6 n. 8 (*citing* Amended Cpt. ¶¶ 112, 113, 120). But the Amended Complaint identifies as infringing items "Related Products," described simply as additional products apart from the CNG and microform products. Both sides address the merits of the infringement claims against the GPO products in their respective summary judgment papers. *See Id.* at 6, 34; Pl. Mem. in Support of Partial Summary Judgment ("Pl. Mem.") 15, 37–38; NG Mem. in Supp. of Motion to Dismiss and for Summary Judgment ("NG Mem.") 20.

The Lanham Act count appears to pertain to the CNG and microform products only. *See* Pl. Opp. Mem. to ProQuest Motion ("Pl. Opp. ProQuest Mem.") 44–47; Pl. Opp. Mem. to NG Motion ("Pl. Opp. NG Mem.") 38–40.

4. ProQuest 56.1 St. in Support of SJ Motion ("ProQuest 56.1 St.") ¶ 1.

5. *Id.* ¶ 9.

6. *Id.* ¶ 11.

7. *Id.* ¶ 18.

8. 533 U.S. 483, 501, 121 S.Ct. 2381, 150 L.Ed.2d 500 (2001).

## Discussion

In view of *Faulkner*'s holdings that the Section 201(c) privilege applies to the CNG and that the privilege is transferable, what remains to be decided in this case is:

- Whether the Section 201(c) privilege applies also to the microform and electronic products,

- Whether any copyright infringement claims with respect to any products that are not privileged under Section 201(c) nevertheless are barred by the statute of limitations, and

- Whether the defendants are entitled to dismissal of the Lanham Act claim.

## I. Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[9] Where the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.[10] In that event, the nonmoving party must come forward with admissible evidence[11] sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.[12]

A court faced with cross-motions for summary judgment need not "grant judgment as a matter of law for one side or the other," but "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."[13]

## II. Copyright Infringement

Plaintiffs assert claims against all defendants for direct and contributory copyright infringement and inducement to infringe copyright, all arising out of the use of plaintiffs' works[14] in the CNG, the microform publications, and the GPO databases. Defendants argue that these claims should be dismissed because, *inter alia*, their use of these contributions in each of the products at issue is privileged under Section 201(c) of the Copyright Act[15] and, to any

---

**9.** *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir.2000); *see also* Fed.R.Civ.P. 56(c).

**10.** *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Virgin At. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 273 (2d Cir.2001).

**11.** *See, e.g., Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 123–24 (2d Cir.2001); *id.*, 164 F.3d 736, 746 (2d Cir. 1998); *Raskin v. Wyatt Co.*, 125 F.3d 55, 65–66 (2d Cir.1997).

**12.** *E.g., Nebraska v. Wyoming*, 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993) (when nonmoving party bears burden of proof at trial, moving party is entitled to summary judgment if nonmovant fails to make showing on essential element of its claim); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995) ("In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim.") (citing *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548).

**13.** *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir.1993) (*quoting Schwabenbauer v. Bd. of Ed.*, 667 F.2d 305, 313–14 (2d Cir.1981) (internal citations omitted)).

**14.** The Court assumes for purposes of these motions that plaintiffs hold the copyrights in the works at issue. In fact, that premise is sharply controverted in all or most instances. That controversy need not be resolved in light of the disposition of these motions.

**15.** Section 201(c) of the 1976 Act provides:

"Copyright in each separate contribution to a collective work is distinct from copyright

extent that the privilege does not apply, the claims are barred by the statute of limitations.

in the collective work as a whole, and vests initially in the author of the contribution. In the absence of an express transfer of the copyright or of any rights under it, the owner of copyright in the collective work is presumed to have acquired only the privilege of reproducing and distributing the contribution as part of that particular collective work, any revision of that collective work, and any later collective work in the same series." 17 U.S.C. § 201(c).

16. NG 56.1 St. ¶ 52; Pl. Opp. 56.1 St. to NG Motion ("Pl. Opp. NG 56.1 St.") ¶ 52; *See* Pl. 56.1 St. ¶¶ 152, 234. Under Section 201(c), the owner of a copyright in a collective work acquires, *absent an express agreement to the contrary,* the privilege of reproducing, *inter alia,* the contribution as part of a revision of the collective work. While the plaintiffs concede that all granted NGS at least one time publication rights, their Rule 56.1 statement claims that these publication rights were limited to print media only and specifically excluded electronic media. Pl. 56.1 St. ¶¶ 152, 153, 234. Were those assertions supported by admissible evidence, there would be genuine issue of facts as to whether inclusion of those contributions in the CNG was protected under Section 201(c). In all but a handful of circumstances, however, there is no such evidence.

Plaintiffs' Rule 56.1 statement cites numerous contracts, deposition testimony, invoices, letters and declarations. Pl. 56.1 St. ¶¶ 152, 153, 234. For the most part, however, these exhibits do not support plaintiffs' claims. The majority of exhibits contain no limitations on NGS' right to use the works in electronic media and therefore do not support plaintiffs' contention. Plaintiffs' declarations that they did not *intend* to grant rights to use their work in electronic archives of the *Magazine* are insufficient to raise a genuine issue of material fact. As this Court explained previously, "statements of subjective intention uncommunicated to the other contracting party are immaterial in construing the terms of the contract." *Faulkner,* 294 F.Supp.2d at 530 n. 30.

Notwithstanding the general paucity of the evidence of agreements to the contrary of the

### A. The CNG and Microform Products

█ The parties agree that NGS had the right to publish plaintiffs' contributions in the *Magazine.*[16] This Court held previ-

Section 201(c) presumption, there is one exception. Plaintiffs' Exhibit 54 contains two invoices that conceivably might raise an issue of fact with respect to a grant of rights with respect to four photographs: a photograph entitled "Siberian Crane" taken by Jean–Paul Ferraro, and three photographs of emperor penguins taken by Graham Robertson. Soni Sept. 6, 2003 Aff. Ex. 54; *see also* Pl. 56.1 St. ¶¶ 72. But the infringement claims based upon these photographs are brought by Auscape International, a photographic agency that licenses photographs on behalf of freelance photographers to third parties. Amended Cpt. ¶¶ 145, 146; NG 56.1 St. ¶ 2. Defendants argue that Auscape lacks standing to pursue the claims under the Copyright Act, as Auscape neither owns the copyrights to nor holds an exclusive license of these works. NG 56.1 St. ¶ 2; *see* 17 U.S.C. § 501(b).

Auscape does not appear to be asserting that it is the copyright owner or exclusive licensee of any of the works at issue. *Compare* NG 56.1 St. ¶ 2, *with* Pl. Opp. NG 56.1 St. ¶ 2. In fact, the evidence is to the contrary. *See* Kenny Dep., 3/19/03, 55:12–20, 86:19–87:4, 141:16–21, 142:11–17. Instead, Auscape claims standing based on the fact that Robertson and the executor of Ferraro's estate authorized Auscape to pursue the claims. *See* Soni Sept. 6, 2003 Aff. Ex. 14; Davis Sept. 8, 2003 Aff. Exs. 9 & 10. It relies on *Silvers v. Sony Pictures Entertainment, Inc.,* 330 F.3d 1204, 1208 (9th Cir.2003), which construed the Copyright Act to permit a third-party assignee of an accrued infringement cause of action even if it is not the owner or exclusive licensee of the copyright.

Auscape argues that this Court is bound to apply *Silvers* because this case was commenced in California and transferred here pursuant to 28 U.S.C. § 1404(a). But there are two flaws to this argument. First, plaintiffs are mistaken that Ninth Circuit interpretation of federal law governs here. While a transferee court should apply the substantive *state law* of the transferor court following a Section 1404(a) transfer, the principle is "inapplicable to federal question claims." *Garrel v. NYLCare Health Plans, Inc.,* No. 98 Civ.

ously that the CNG is a revision of a collective work, more specifically, the individual print issues of the *Magazine*, and that it is protected under Section 201(c) absent agreement depriving defendants of that protection.[17] To the extent that plaintiffs' claims involve the CNG, the prior holding is dispositive.

The microform products present no substantial issue. The relevant inquiry in determining whether a product is a revision under Section 201(c) is "whether the original contribution is presented in the same context in which it appeared in the initial collective work."[18] As articles "appear on ... microforms, writ very small, in precisely the position in which [they] appeared in the [*Magazine*],"[19] the micro-

form products too are revisions protected under Section 201(c).[20]

### B. The Electronic Databases

#### 1. Section 201(c)

■ The GPO databases differ from the CNG and microform products in that they allow the user to view individual articles standing alone, apart from the contexts in which they appeared in the original collective works.[21] In *Tasini*, the Supreme Court held that the use of freelance writers' contributions to three print periodicals in the GPO database was not privileged under Section 201(c).[22] Thus, to the extent that either the ProQuest or National Geo-

9077(BSJ), 1999 WL 459925 *8 (S.D.N.Y. June 29, 1999); *see also Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir.1993). In this circuit, copyright owners may not "choose third parties to bring suits on their behalf." *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 944 F.2d 971, 980 (2d Cir.1991) (*citing Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 32 n. 3 (2d Cir.1982)). Hence, the fact that the putative copyright holders authorized Auscape to bring claims on their behalf is insufficient to confer standing upon Auscape.

Second, the Ninth Circuit recently granted rehearing *en banc* in *Silvers*. *Silvers v. Sony Pictures*, 370 F.3d 1252 (9th Cir.2004). Thus, the law of the Ninth Circuit on this point is unclear. At least with respect to the copyright infringement claims, Auscape lacks standing and defendants' motions for summary judgment dismissing the copyright infringement claims with respect to these four photographs are granted, even assuming the existence of a genuine issue of fact as to whether any agreements with respect to the rights granted by plaintiffs to these works defeat the Section 201(c) presumption.

17. *Faulkner*, 294 F.Supp.2d at 543.

18. *Id.* at 540.

19. *Tasini*, 533 U.S. at 501, 121 S.Ct. 2381.

20. *See Faulkner*, 294 F.Supp.2d at 540–41 & n. 85.

Plaintiffs contend that the microform products are not exact replicas of the print editions of the magazines, but incorporate "significant changes" made by the ProQuest defendants. *See* Pl. Opp. ProQuest Mem. 28. For example, plaintiffs claim that the process of transferring the print images to microform required PQIL employees to make subjective determinations regarding the color quality, background, and positioning of images. Pl. Opp. 56.1 St. to ProQuest Motion ¶ 12; Pl. 56.1 St. ¶ 163. The ProQuest defendants contest this statement, explaining that, while evaluation of proofs involves subjective determinations, the goal, like that of someone creating a photocopy of a paper document, is to ensure that the microform copy is a "faithful reproduction and reasonably true to the original paper copy." ProQuest Opp. 56.1 St. ¶ 163. Any subjective decisions made by PQIL employees were necessary given the technological requirements of transferring images from print to microform and were intended to preserve, not change, the appearance of the print version. Any variations thus created were insignificant and did not remove microform from the protection of Section 201(c).

21. *Tasini*, 533 U.S. at 488, 121 S.Ct. 2381.

22. *Id.* at 500–06, 121 S.Ct. 2381.

graphic defendants assert a Section 201(c) defense, it is without merit.[23]

Defendants' attempt to distinguish *Tasini* fails. That *Tasini* concerned only textual, and not photographic, works and that GPO's search function for photographers differs from that for authors, as the ProQuest defendants argue,[24] is immaterial for Section 201(c) purposes. In either case, the user may view the allegedly infringed work as part of an individual article completely removed from the context in which it appeared in the particular issue of the *Magazine*.

### 2. Statute of Limitations

The question with respect to the GPO databases that remains is whether plaintiffs' copyright infringement claims are barred by the statute of limitations.

A copyright infringement claim must be commenced within three years of the date on which the cause of action accrued.[25] Defendants argue that any infringement ended more than three years prior to the filing of this complaint on January 31, 2002 and that plaintiffs' claims regarding the electronic databases therefore are barred by the statute of limitations.

### a. Date of Alleged Infringement

The continuing infringement doctrine is unavailable in the Second Circuit.[26] Thus, plaintiffs may recover only for acts of infringement that occurred within the three years next preceding suit unless, of course, the cause of action accrued later than the infringement date or they can demonstrate that the statute of limitations has been tolled.[27] Accordingly, the initial question is whether any acts of infringement occurred on or after January 31, 1999.

Any direct copyright infringement claims against the National Geographic defendants with respect to GPO arise from their licensing of the 1988 through 1993 issues of the *Magazine* to the ProQuest defendants. While the parties dispute whether current subscriptions to GPO include access to the archived issues of the *Magazine*, it is undisputed that NGS's contract with the ProQuest defendants ended in 1993.[28] Thus, any direct infringement by the National Geographic defendants ended in 1993, nine years before the filing of this case. They cannot be held responsible, at least as direct infringers, for any alleged infringement by the ProQuest defendants since that time.[29]

23. The ProQuest defendants and plaintiffs devote much space to the issue whether they are collaterally estopped from asserting the defense, as they, but not the National Geographic defendants, were defendants in *Tasini*. But they miss the point. The Supreme Court has held that the publication in the GPO database of works that first appeared in print editions of newspapers and magazines is not privileged under Section 201(c). *Tasini* therefore controls by virtue of *stare decisis* without regard to collateral estoppel.

24. ProQuest Opp. Mem. 10.

25. 17 U.S.C. § 507(b).

26. *Kregos v. Associated Press*, 3 F.3d 656, 662 (2d Cir.1993).

27. *Id.*

28. *See* Davis Sept. 8, 2003 Aff. Exs. 52 & 53; Soni Sept. 6, 2003 Aff. Exs. 141 & 151. Although the National Geographic defendant's Exhibit 52 is unsigned, plaintiffs have not objected to its admissibility and thus have waived any objection to its consideration. *E.g., DeCintio v. Westchester County Med. Ctr.*, 821 F.2d 111, 114 (2d Cir.1987). Plaintiffs' conclusory objections to the Davis Affirmation are overruled.

29. *Mount v. Book–of–the–Month Club, Inc.*, 555 F.2d 1108, 1110 (2d Cir.1977).

■ Determining the last date of any infringement by the ProQuest defendants is not as simple. According to the ProQuest defendants, any infringement by them in including plaintiffs' contributions in the GPO databases ended no later than 1996.[30] Thus, defendants have met the initial burden of showing an absence of infringement during the limitations period. In these circumstances, plaintiffs may avoid summary judgment on limitations grounds only by coming forward with admissible evidence sufficient to raise a genuine issue of fact which, if resolved in their favor, would demonstrate that any infringement by the ProQuest defendants continued until at least January 31, 1999.

Plaintiffs' opposition to ProQuest's Rule 56.1 statement seeks to do this by citing a faxed copy of an exhibit to defendants' expert report of Lauren J. Stiroh, which allegedly demonstrates that ProQuest paid royalties to NGS in relation to the GPO products through 2001.[31] This exhibit is insufficient on its own. Not only is the expert report itself not before the Court, but plaintiffs have provided no information regarding how the numbers in the exhibit were computed, whether any royalties paid in a given year arose from the sale of the allegedly infringing items, and whether payments were made with respect to sales in years within the limitations period or were in respect to sales in previous years.

As plaintiffs have failed to raise a genuine issue of fact as to the existence of infringement within the three years next preceding the filing of the complaint, the undisputed fact is that any infringement by ProQuest with regard to the GPO products ended no later than 1996.

### b. Accrual

■ Plaintiffs argue that their claims nevertheless are timely on the theory that the claims did not accrue until plaintiffs first learned of the availability of their works in the GPO databases which, they claim, was just prior to the commencement of this case.[32] Essentially, then, the issue is whether an infringement claim accrues at the time of the infringement (the "injury rule") or, as plaintiffs contend, when the plaintiff "knows or has reason to know" of the injury upon which the claim is based (the "discovery rule").[33]

### (1) Case Law

The Supreme Court has not determined whether the injury or discovery rule governs accrual of copyright infringement claims. Nor has the Second Circuit ruled on the issue. Those district courts within this Circuit to have considered the issue

---

**30.** ProQuest 56.1 St. ¶ 18; Hirth Decl. ¶ 22. Plaintiffs' conclusory objections to the Hirth declarations are overruled.

**31.** Pl. Opp. to ProQuest 56.1 St. ¶ 18; Soni Aff. Ex. 153. In their June 14, 2004 supplemental memorandum, the National Geographic defendants made an unsworn statement that NGS received royalties until 2001 on "sporadic sales" of previous editions of the GPO databases. NG Supp. Mem. 17 n. 11. This is not evidence sufficient to raise a genuine issue of material fact as to whether the ProQuest defendants infringed plaintiffs' copyrights later than 1996. Even assuming the evidence were material, it is inadmissible. While the unsworn statement may be admissi-

ble against the National Geographic defendants as an admission under Fed.R.Evid. 801(d)(2), it is hearsay as against the ProQuest defendants. Accordingly, it is not properly considered on the motions for summary judgment. *See Nora Beverages,* 269 F.3d at 123–24; *id.,* 164 F.3d at 746; *Raskin,* 125 F.3d at 66 (district court need consider only admissible evidence in ruling on motion for summary judgment).

**32.** Pl. Opp. NG Mem. 58.

**33.** The parties submitted supplemental briefing on this issue pursuant to an order dated May 11, 2004.

are divided, with the majority holding that accrual is governed by a discovery rule.[34]

In concluding that a discovery rule applies to infringement claims, courts in this Circuit, as well as plaintiffs, rely almost exclusively upon *Merchant v. Levy.*[35] In that case, the Second Circuit followed *Stone v. Williams*[36] in applying a discovery rule to hold that plaintiffs' claims for a declaration of copyright co-ownership were barred by the statute of limitations. But *Merchant* and *Stone* may not be applied uncritically here.

To begin with, *Merchant* was not an infringement case. While plaintiffs would have this Court extend it to the infringement context, examination of *Merchant*, the foundation upon which it rests, and Section 507(b) of the Copyright Act leads this Court to a different conclusion.

In considering *Merchant*, it is important to recognize that many federal courts long applied a discovery rule, in absence of any authority to the contrary, in determining when claims under a plethora of federal statutes accrued.[37] When confronted in *Stone* with the question when a claim for co-ownership of copyright accrued, our Circuit simply applied this general rule without examining the text or the legislative history of the Copyright Act. It relied exclusively upon a line of civil rights and RICO cases, all of which pointed to a Fourth Circuit latent medical injury case[38] for the general rule that accrual of a federal claim is governed by a discovery rule unless the statute upon which it is founded explicitly provides otherwise. *Merchant* simply followed *Stone*, although the panel noted that only co-ownership claims and not infringement claims were involved.[39] Thus, plaintiffs' argument for applying a discovery rule to a copyright infringement claim is doubly questionable. First, the *Merchant* panel itself made clear that it was not resolving that issue. At least equally important, *Merchant* and *Stone* rest entirely on then prevalent views re-

---

34. *Compare Barksdale v. Robinson,* 211 F.R.D. 240, 245 (S.D.N.Y.2002); *Lennon v. Seaman,* 63 F.Supp.2d 428, 433 (S.D.N.Y.1999); *Favia v. Bronx Council of the Arts,* No. 93 Civ. 5936(CSH), 1995 WL 358750, at *2 (S.D.N.Y. June 14, 1995); *Repp v. Webber,* 914 F.Supp. 80, 83 (S.D.N.Y.1996) (injury rule), *with Sapon v. DC Comics,* 62 U.S.P.Q.2D 1691, 1695 (S.D.N.Y.2002); *Armstrong v. Virgin Records, Ltd.,* 91 F.Supp.2d 628, 640 (S.D.N.Y.2000); *Maurizio v. Goldsmith,* 84 F.Supp.2d 455, 461 (S.D.N.Y.2000); *Yurman Design Inc. v. Chaindom Enters., Inc.,* No. 99 Civ. 9307(JFK), 1999 WL 1075942, at *7 (S.D.N.Y. Nov. 29, 1999); *Zitz v. Pereira,* 119 F.Supp.2d 133, 141 (E.D.N.Y.1999), *Rosner v. Codata Corp.,* 917 F.Supp. 1009, 1019 (S.D.N.Y.1996) (discovery rule).

Other circuits have applied a discovery rule in infringement cases, albeit without any analysis. *See, e.g., Bridgeport Music, Inc. v. Diamond Time, Ltd.,* 371 F.3d 883, 889 (6th Cir.2004); *Hotaling v. Church of Jesus Christ of Latter-Day Saints,* 118 F.3d 199, 202 (4th Cir.1997); *Roley v. New World Pictures,* 19 F.3d 479, 481 (9th Cir.1994).

35. 92 F.3d 51 (2d Cir.1996).

36. 970 F.2d 1043 (2d Cir.1992).

37. *See Rotella v. Wood,* 528 U.S. 549, 555, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000).

38. *See Young v. Clinchfield Railroad Co.,* 288 F.2d 499 (4th Cir.1961).

39. While the Second Circuit stated that the discovery rule governed in *Merchant,* it did not engage in extended analysis on this point, as the jury had made a factual determination as to the date of accrual. In following *Stone,* the *Merchant* panel noted that *Stone* was a highly idiosyncratic case, limited to the "narrow proposition that, in certain situations, the statute of limitations will not be applied to defeat the copyright co-ownership claim of an author's relative ... where uncertainty surrounded the relative's status as a member of the author's family." *Merchant,* 92 F.3d at 56.

garding the accrual of federal claims generally.

In 2001, the Supreme Court altered this landscape. In *TRW v. Andrews*,[40] it reversed application of a discovery rule in determining when a claim accrued under the Fair Credit Reporting Act. It rejected the previously dominant view that federal courts should apply an injury rule only when Congress explicitly has adopted that rule, requiring instead that federal courts look beyond the specific language of a statute to its text and structure in determining what rule should apply when the statute is silent.

In light of these considerations, two things are clear in the aftermath of *TRW*. First, it is uncertain whether *Stone* and *Merchant* remain good law even in the co-ownership context, as both were premised upon the automatic application of the discovery rule that the Supreme Court rejected in *TRW*. Second, regardless of whether *Stone* and *Merchant* continue to govern in the co-ownership context, *TRW* demonstrates that uncritical extension of those cases to the infringement context would be unwarranted. Instead, *TRW* requires examination of the statutory structure and legislative history in determining whether a discovery or injury rule should apply where, as here, the statute itself is silent on the issue.

### (2) The Text

As *TRW* confirmed, the starting point in construing a statute must be the text.[41] In *TRW*, the Supreme Court noted that the structure of the Fair Credit Reporting Act was instructive in determining congressional intent notwithstanding its failure to define accrual in the statutory text. In particular, although the statute did not state explicitly which rule should govern, it contained an exception under which a discovery rule was to apply.[42] The Supreme Court reasoned that application of a discovery rule to the statute in its entirety would render the exception superfluous and therefore be inappropriate.

Here, the text of the Copyright Act is not so illuminating as to Congress' intent with regard to when an infringement claim accrues. It states only that a civil copyright infringement claim must be brought "within three years after the claim accrued."[43] Where the text and structure of the statute lend no guidance, the Court must turn to the legislative history.[44]

### (3) Legislative History

Until 1957, the Copyright Act contained a statute of limitations only for criminal actions. Federal courts looked to the state periods of limitations in determining timeliness of the civil claims, including copyright infringement. Thus, different periods of limitation and different rules regarding accrual and tolling applied, depending on where the claim was brought.

In 1955, Congress began to examine this problem and held hearings on a bill to enact a civil statute of limitations, the culmination of which was the adoption of what today is Section 507(b). The hearings, as well as the reports of committees of both houses of Congress, are instructive as to Congress' intent on the issue of accrual.

---

**40.** 534 U.S. 19, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001).

**41.** *See Saks v. Franklin Covey Co.*, 316 F.3d 337, 345 (2d Cir.2003).

**42.** 15 U.S.C. § 1681 et seq.

**43.** 17 U.S.C. § 507(b).

**44.** *E.g., Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 290 (2d Cir.2002).

The hearings make clear the broad dissatisfaction with the uncertainty caused by reliance on state statutes of limitation. An infringer could face a statute of limitations of as long as eight years or as short as one year depending on the state in which the infringement occurred. Not only were users of intellectual property "interested in a fixed statute of limitations to know when they [would be] liable,"[45] but lawyers for both sides supported a uniform period as clarifying a situation described to Congress as "quite confusing."[46]

Against this background, the Senate Report stated in relevant part:

"All of [the] witnesses [at the hearings before the House Judiciary Committee on an identical bill in the 84th Congress] agreed to a 3-year uniform period, feeling that this represents the best balance attainable to this type of action. It was pointed out that due to the nature of publication of works of art that generally the person injured receives reasonably prompt notice or can easily ascertain any infringement of his rights. The committee agrees that 3 years is an appropriate period for a uniform statute of limitations for civil copyright actions and that it would provide an adequate opportunity for the injured party to commence his action."[47]

From this statement, two things are clear.

First, the goal of a uniform three year limitations period was to remove the uncertainty concerning timeliness that had plagued the copyright bar. Given that the goal was a *fixed* statute of limitations, it seems unlikely that Congress intended that accrual of an infringement claim—and hence the length of the interval between an infringement and the statutory time bar—would depend on something as indefinite as when the copyright owner learned of the infringement.

A second inference can be drawn from the Senate Report's express reliance on the record developed at the hearings: Congress, as well as participants in the hearings, intended the three-year period to begin at the date of infringement. At the hearings, it was pointed out that "copyright infringement by its very nature is not a secretive matter."[48] To the contrary, it is "an act which normally involves the general publication of the work or its public performance."[49] The public nature of infringement was an important consideration to Congress in drafting the language of the statute. The Senate Report makes clear that the relevant Senate committee regarded a three-year period as sufficient to provide an "adequate opportunity" for the owner to commence his case precisely because copyright owners generally receive "reasonably prompt notice" of infringement.

Certainly, Congress was aware that situations would arise in which a copyright owner might not know or have reason to know of an infringement within three years after its occurrence. Representative Crumpacker presented such a situation in

45. *Copyrights—Statute of Limitations: Hearing on H.R. 781 Before the House Comm. On the Judiciary, Subcomm. 3,* 84th Cong. 40 (1955) *("House Hearings")* (statement of Fulton Brylawski, Association of American Motion Pictures).

46. *Id.* at 36 (statement of Vincent T. Wasilewski, Nat'l Assn. Of Radio and Television Broadcasters).

47. S. Rep. No. 85–1014, at 2 (1957), *reprinted in* 1957 U.S.C.C.A.N.1961, 1962.

48. *House Hearings* at 11 (statement of George D. Carey, Principal Legal Advisor to the Copyright Office).

49. *Id.* at 51 (letter statement of Sydney M. Kaye, lawyer and private citizen).

a hypothetical question at the House Hearings, asking what would occur if a movie were shown to a small audience in a small town and then not shown again for three years. A representative of the Association of the American Motion Pictures responded, "[e]very performance of every moving picture is a separate infringement—if they occurred three years ago. That [*sic*] would be barred in three years."[50] In other words, whether the copyright owner was aware of the exhibition of the infringing movie was irrelevant; the statute of limitations for an infringement claim concerning that particular showing of the movie would expire three years after the movie was shown, regardless of when the copyright owner learned of the exhibition. Thus, Congress was well aware that the statute of limitations it was enacting would not necessarily allow a remedy for every wrong. It at least implicitly acknowledged "that the passage of time must leave some wrongs without a remedy."[51]

The commencement of the running of the pre-existing state periods of limitation also is instructive, as there is no suggestion in the House Hearings or the congressional reports that Congress intended a different rule to govern the uniform limitations period then under consideration. What discussion there was on this topic at the Hearings suggests that the state periods of limitation commenced upon the date of infringement. For example, in response to a question by Representative Willis concerning his experience under the prior state law, a spokesman for the motion picture industry responded that the time during which an infringer would be subject to suit depended entirely on the state and the date of the infringement. He stated, "if I, as an infringer, were living in the state of California and I committed an infringement in California I would be subject to suit at any time within two years. At the end of the two years I could not be sued."[52] Thus, it was the infringement date and not the date the copyright owner became aware of the infringement that governed accrual of the cause of action. Even stronger support can be found from a letter included in the Hearings which argued that "[t]here would seem to be no reason why three years *from infringement* would not be a sufficient period to permit the institution of legitimate suits."[53]

The conclusion that Congress intended infringement claims to accrue upon infringement rather than upon discovery is supported also by its consideration of statutory exceptions for fraudulent concealment and other equitable doctrines ameliorating the statute of limitations.[54] The question whether to enact such exceptions, particularly an exception for fraudulent concealment, was a substantial focus of the hearings. Had those involved in the hearings thought that a discovery rule would govern accrual of an infringement claim, however, a statutory exception for fraudulent concealment would have been entirely

---

**50.** *Id.* at 48 (statement of Fulton Brylawski, Association of American Motion Pictures).

**51.** *Pearl v. City of Long Beach,* 296 F.3d 76, 77 (2d Cir.2002).

**52.** *House Hearings* at 39 (statement by Fulton Brylawski).

**53.** *Id.* at 50 (letter statement of Sydney M. Kaye, lawyer and private citizen) (emphasis added).

**54.** These situations included (1) the absence of the defendant from the United States, (2) the legal disability of the plaintiff, (3) the period of time between the death of either party and appointment of an executor or administrator, and (4) any time during which the cause of action was fraudulently concealed. S. Rep. No. 85–1014, at 2–3 (1957), *reprinted in* 1957 U.S.C.C.A.N.1961, 1962.

superfluous. In other words, if an infringement claim would not accrue until the copyright holder knew of the infringement, the question whether the holder's ignorance was attributable to simple ignorance or concealment would have been immaterial.[55]

In short, the legislative history of Section 507(b) makes it strikingly clear that Congress intended to adopt a three-year limitations period running from the date of the infringement, as a discovery rule would have defeated its overriding goal of certainty.

### (4) Other Considerations

Supreme Court precedent concerning statutes of limitations in other contexts also supports the application of an injury rule here.

First, the Court has indicated that a discovery rule should be used only in those cases where the "cry is loudest."[56] As it reminded us only recently in *TRW*, it has adopted such a rule only in two contexts, latent disease and medical malpractice,[57] situations quite different from copyright infringement. The very nature of a latent medical injury is that it does not manifest itself immediately. It would be harsh indeed to commence running of the limitations period before the individual could possibly know of what might be a serious injury. In a copyright infringement case, on the other hand, the author knows of his copyright ownership from the beginning and, in most cases, the infringement occurs in public. Thus, copyright infringement is not often an extreme situation crying out for a discovery rule.

Applying an injury rule to copyright infringement claims is consistent also with the "standard rule that the limitations period commences when the plaintiff has a complete and present cause of action."[58] Unless Congress says otherwise, a cause of action is complete and present once a plaintiff may file suit and obtain relief.[59] In the copyright infringement context, the right to sue ripens at the time of the infringement itself. This is contrasted with a situation like copyright co-ownership, in which the injury underlying a cause of action may not occur until one co-owner asserts exclusive rights to the detriment of the other.

For all of the foregoing reasons, this Court holds that a claim for copyright infringement accrues on the date of the infringement. Accordingly, plaintiffs' claims with regard to the GPO products all accrued by the end of 1996 at the latest and are untimely unless plaintiffs have

---

**55.** Plaintiffs gain nothing from the fact that Congress ultimately declined to enact fraudulent concealment or other equitable exceptions to the statute of limitations, as this did *not reflect an intention to adopt a discovery* rule. The legislative history is plain that Congress declined to do so because it expected that federal courts would continue to apply fraudulent concealment and other equitable case law as they had done previously. H.R. Rep. No. 85–150, 85th Cong., 1st Sess., at 2 (1957); *see also House Hearing* at 25 (remarks of Rep. Edwin E. Willis) (evidencing intention to require proof of due diligence as well as other requirements of doctrine of fraudulent concealment to avoid bar of the statute of limitations).

**56.** *TRW*, 534 U.S. at 27–31, 122 S.Ct. 441 (quoting *Rotella*, 528 U.S. at 555, 120 S.Ct. 1075).

**57.** *See, e.g., United States v. Kubrick*, 444 U.S. 111, 122, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979) (latent medical injury).

**58.** *See Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp.*, 522 U.S. 192, 201, 118 S.Ct. 542, 139 L.Ed.2d 553 (1997) (internal quotation omitted).

**59.** *Id.*

raised a triable issue of fact which, if resolved in their favor, would toll running of the statute for a sufficient period.[60]

### c. Tolling

Plaintiffs argue that even if their claims accrued more than three years prior to the commencement of this action, the statute of limitations should be tolled for two reasons.

First, plaintiffs appear to suggest that the ProQuest defendants fraudulently concealed the GPO databases.[61] This argument, if plaintiffs are indeed making it, may be disposed of summarily. There simply is no evidence that any of the defendants fraudulently concealed anything, regardless of whether the individual plaintiffs knew of the databases.

■ Second, plaintiffs contend that the statute of limitations for their copyright infringement claims was tolled in 1999 by the filing of the class action in *Faulkner v. National Geographic Society ("Faulkner*

*II")*,[62] which was commenced as a purported class action. But this argument too fails.

In *American Pipe & Construction Co. v. Utah*,[63] the Supreme Court held that "the commencement of the original class suit tolls the running of the statute for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status."[64] The Court extended the rule in *Crown, Cork & Seal Co. v. Parker*,[65] where it held that the statute is tolled also as to members of an alleged class who file individual actions after the denial of class certification. In either situation, the statute of limitations remains tolled only until class certification is denied, at which point it begins to run again from where it left off.[66]

Here, the running of the statute of limitations with respect to the GPO products commenced no later than December 31, 1996.[67] *Faulkner II* was filed as a class

---

**60.** Even assuming *arguendo* that a discovery rule applied, the evidence is insufficient to sustain plaintiffs' burden of raising a genuine issue of fact which, if resolved in their favor, would render their claims timely. Under the discovery rule, the claims would have accrued when plaintiffs knew or *reasonably should have known* of the infringement. Plaintiffs claim this was not until they learned of the existence of the GPO databases, which occurred immediately prior to the filing of the suit. But the only evidence cited in their Rule 56.1 statement in support of this claim—portions of declarations and deposition testimony of various plaintiffs—concerns plaintiffs' awareness of the microform products, not GPO. There is no admissible evidence that plaintiffs did not learn of the GPO until 2002. Hence, even if plaintiffs' accrual argument were correct as a matter of law, and the Court holds that it is not, there is no genuine issue of material fact that the cause of action accrued later than the infringement date. *See Rosner*, 917 F.Supp. at 1017.

**61.** *See* Pl. Opp. to ProQuest Mem. 41 n. 60; ProQuest Supp. Mem. 13 n. 4. *See also* Pl. Reply 23–24.

**62.** Pl. Reply 23. Lest there be any confusion, two cases were entitled *Faulkner v. National Geographic Society* at their inception, 97 Civ. 9361, in which the lead plaintiff was Douglas Faulkner, and 99 Civ. 12488, in which the lead plaintiff was Sally Faulkner. In the course of pre-trial proceedings, the latter, *Faulkner II*, was re-titled *Hiser v. National Geographic Society*, although it retains its initial title on the docket sheet. In an effort to be consistent with the parties' papers, the Court will refer to it here as *Faulkner II*.

**63.** 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974).

**64.** *Id.* at 553, 94 S.Ct. 756.

**65.** 462 U.S. 345, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983).

**66.** *Id.* at 354, 103 S.Ct. 2392.

**67.** As noted above, the infringement claims concerning GPO accrued by the end of 1996.

action December 29, 1999, two days before the latest possible expiration of the limitations period governing the claims against ProQuest based on the GPO databases. Assuming *arguendo* that the filing of *Faulkner II* tolled the statute, the toll would have ended on May 18, 2000, the date on which class certification in *Faulkner II* was denied.[68] Accordingly, plaintiffs then would have had until May 20, 2000 to file an individual action or to intervene in *Faulkner II*. Plaintiffs did not file the current action until January 31, 2002, over 20 months after the statute of limitations had expired. Thus, irrespective of whether the statute of limitations was tolled by the filing of *Faulkner II*, plaintiffs' claims regarding the GPO were untimely.[69]

**68.** *See* Order in *Faulkner v. National Geographic Soc'y*, No. 99 Civ. 12488 (S.D.N.Y. filed May 18, 2000).

**69.** Whether tolling would apply in this action is unclear. This case was brought as a class action, certification of which was denied October 3, 2003. *See* Order, Oct. 3, 2003. But the Second Circuit held in *Korwek v. Hunt*, 827 F.2d 874 (2d Cir.1987), that "the tolling rule established by *American Pipe* ... was not intended to be applied to suspend the running of statutes of limitations for class action suits filed after a definitive determination of class certification." *Id.* at 879. In other words, plaintiffs may not "piggyback one class action onto another and thus toll the statute of limitations indefinitely." *Id.* at 878 (quoting *Salazar–Calderon v. Presidio Valley Farmers Ass'n.*, 765 F.2d 1334, 1351 (5th Cir.1985), *cert. denied*, 475 U.S. 1035, 106 S.Ct. 1245, 89 L.Ed.2d 353 (1986)). A second class action does not get the benefit of the filing date of the first.

It is true, as plaintiffs argue, that the limitations period is tolled in some circuits even if the second case is a class action where class certification in the first action was denied based on inadequate representation. *See, e.g., McKowan Lowe & Co. v. Jasmine, Ltd.*, 295 F.3d 380, 389 (3d Cir.2002); *In re Quarterdeck Office Systems, Inc. Sec. Litig.*, No. CV–

## C. Contributory Infringement

Plaintiffs assert also claims for contributory infringement and inducement to infringe copyright against all defendants. To the extent that the alleged copyright infringement claims have failed, there is no basis upon which to hold defendants liable for contributory infringement or inducement to infringe copyright.[70] Accordingly, defendants' motions for summary judgment dismissing the contributory infringement claims are granted *pari passu.*

## III. The Lanham Act

Defendants move for summary judgment dismissing plaintiffs' claims for false designation of origin under Section 43(a) of

92–3970–DWW (GHKX), 1994 WL 374452 at *5 (C.D.Cal. Mar. 24, 1994); *Shields v. Washington Bancorp.*, Civ. A. No. 90–1101, 1992 WL 88004 (D.D.C. April 7, 1992); *but see Griffin v. Singletary*, 17 F.3d 356 (11th Cir. 1994) (no tolling where class certification denied based on inadequate representation). The Second Circuit has not addressed this issue. But even were the Second Circuit to create an exception to *Korwek* for those cases where denial of class certification in the first action was based on inadequate representation, however, it is not clear that the present case would fall into that exception. In those cases where the filing of the subsequent class action received the benefit of tolling, plaintiffs were interveners and class certification was determined ultimately to be an appropriate method of addressing the claims. In this action, plaintiffs are the ones who filed the subsequent class action and this Court ultimately determined that class certification was inappropriate for reasons other than inadequate representation. *See* Order, Oct. 3, 2003. Thus, even if this case would have been timely had it been filed as an individual action, it is not clear that it would be timely given its filing as a class action.

**70.** *See Matthew Bender & Co., Inc. v. West Publ'g Co.*, 158 F.3d 693, 706 (2d Cir.1998); *Faulkner*, 294 F.Supp.2d at 546.

the Lanham Act[71] with regard to the CNG and microform products, and false advertising with regard to the CNG.

### A. False Designation of Origin

As far as the Court can tell, plaintiffs' false designation of origin claims are based on (1) alleged misrepresentation of NGS as the creator of the works in the CNG,[72] (2) alleged obliteration of the copyright notices in plaintiffs' images in both the CNG and microform products,[73] and (3) use of plaintiffs' names in copyright notices in the microform products.[74]

■ Plaintiffs' first false designation claim with regard to the CNG essentially is a claim of "reverse palming off."[75] Plaintiffs argue that the National Geographic defendants' claim of copyright in the CNG misleads the public as to the source of the images in the CNG anthology. But the product at issue, the CNG, originated with NGS and not plaintiffs.[76] NGS owns the copyright in the collective work regardless of whether plaintiffs retained copyright in their individual contributions. Thus, the copyright notice in-

cluding the name of NGS at the bottom of each page was appropriate.

■ The second false designation claim relates to both the CNG and the microform products. Plaintiffs allege that defendants obliterated the copyright notices in plaintiffs' images, in effect publishing the images without proper attribution. To the extent plaintiffs' claim is based on the alleged failure to credit plaintiffs for their individual contributions, it is duplicative of the copyright claims.[77] As the Second Circuit has held repeatedly, "a false copyright notice alone cannot constitute a false designation of origin within the meaning of § 43(a) of the Lanham Act."[78] Instead, plaintiffs must show the "requisite affirmative action of falsely claiming originality beyond that implicit in any allegedly false copyright."[79]

Plaintiffs attempt to make such a showing, arguing that the ProQuest defendants modified their individual contributions in the microform products and that the National Geographic defendants intentionally blurred image credits.[80] There is no evi-

---

71. 15 U.S.C. § 1125.

72. Pl. Opp. NG Mem. 40.

73. See Id.; Pl. Opp. ProQuest Mem. 45.

74. See Pl. Opp. ProQuest Mem. 46.

75. Lipton v. The Nature Co., 71 F.3d 464, 473 (2d Cir.1995) (describing "reverse passing off" as the attempts of party A to sell party B's product under party A's name and laying out elements).

76. See generally Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 123 S.Ct. 2041, 156 L.Ed.2d 18 (2003) (phrase "origin of goods" in the Lanham Act refers to producer of tangible goods in marketplace and not the author of the idea or communication contained in the goods).

77. See Kregos v. Associated Press, 937 F.2d 700, 711 (2d Cir.1991) ("If Kregos is simply

saying that the notice is false ... in that the form is, under the copyright law, an infringement of Kregos' form, we reject his attempt to convert all copyright claims into Lanham Act violations.")

78. Lipton, 71 F.3d at 473.

79. Weber v. Geffen Records, Inc., 63 F.Supp.2d 458, 464 (S.D.N.Y.1999); Armstrong, 91 F.Supp.2d at 633.

80. Pl. Opp. NG Motion 40; Pl. Opp. ProQuest Mem. 45. Plaintiffs argue that the microform products are not exact replications of the print versions, as ProQuest employees made a number of "subjective decisions" regarding the color, background and positioning of the images in making the transfer from print to microform. Pl. Opp. 56.1 St. to ProQuest Motion ¶ 12. Likewise, plaintiffs allege that NGS purposefully selected a scanning process that made the images, including the image

dence, however, that could support a finding that defendants falsely held themselves out as owners.[81] To the extent plaintiffs have a claim regarding defendants' alleged failure to attribute properly the images in the CNG and microform products to plaintiffs, the claims belong under the Copyright Act, not the Lanham Act.[82]

Finally, the print editions of the *Magazine* contained copyright notices for individual photographic and text contributions in which copyright remained with the author. These copyright notices were reproduced in the microform products. Plaintiffs appear to contend that the reproduction of their names in these notices constituted a false designation of origin because the images had been subtly altered in the course of transforming them from print to microform.[83]

The truthful use of an author's name in describing authorship is not a false designation of origin.[84] To be sure, the use of the author's name to suggest authorship or approval of a work substantially modified without the author's consent would be an-

other matter.[85] Suffice it to say here, however, that ProQuest's goal was faithful reproduction of the authors' works.[86] No reasonable trier of fact could find any substantial alteration.[87] Accordingly, the false designation of origin claim fails.

## B. False Advertising

■  Plaintiffs' false advertising claim against the National Geographic defendants is equally insufficient. Essentially, plaintiffs claim that the CNG is not "complete" as advertised in that sixty images have been blacked out and the CNG does not include certain regional editions.[88] Defendants argue that plaintiffs do not have standing to assert such a claim, as there is no potential for commercial injury by the claim that the CNG is "complete" where plaintiffs have no similar product. But the Court need not reach that issue.

To establish a false advertising claim, plaintiffs would have the burden at trial of demonstrating both that (a) the challenged advertisement is false and, (b) defendants

---

credits, in the CNG fuzzy. Pl. Opp. 56.1 St. to NG Motion ¶¶ 36, 89.

81. Any modifications to the images resulted from their transformation from print to microform and were not the type of additional factor that would support a Lanham Act violation based on false designation of origin. *See* Mottice Dep., Soni Aff. Ex. 100. Plaintiffs' allegation concerning the intentional blurring of image credits in the CNG is not supported by the evidence cited in their Rule 56.1 statement. *See* Fahey Decl. ¶ 23. Plaintiffs' conclusory objections to the Fahey declaration are overruled.

82. *See Faulkner v. National Geographic Soc'y,* 211 F.Supp.2d 450, 478 (S.D.N.Y.2002) ("there is no misrepresentation of origin that does not reduce ultimately to unauthorized exploitation of rights that allegedly belong to the true copyright holder.")

83. *See* Pl. Opp. ProQuest Mem. 46.

84. *See* 3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 8D.03[B][2], at 8D–43 (2003).

85. *See Gilliam v. American Broadcasting Cos., Inc.,* 538 F.2d 14 (2d Cir.1976) (Where a work has been edited into "a form that departs substantially from the original work[,] ... it is the writer or performer ... who suffers the consequences of the mutilation, for the public will have only the final product by which to evaluate the work.")

86. ProQuest Opp. 56.1 St. ¶ 163.

87. *See Choe v. Fordham University School of Law,* 920 F.Supp. 44, 48–49 (S.D.N.Y.1995); *Playboy Enter., Inc. v. Dumas,* 831 F.Supp. 295, 315–17 (S.D.N.Y.), *modified on other grounds,* 840 F.Supp. 256 (1993), *aff'd in part, rev'd in part,* 53 F.3d 549 (2d Cir.1995).

88. Pl. Opp. NG Mem. 39; Pl. Opp. NG 56.1 St. ¶¶ 197–200.

"misrepresented an inherent quality or characteristic of the product."[89] The latter includes a requirement of materiality.[90] But plaintiffs have failed to meet their burden under Celotex, as there is no evidence that would support a finding that the blacking out of sixty of some eighty thousand images or the failure to include some regional editions are material with regard to a CD–ROM containing issues of a magazine spanning over a century.[91]

In their opposition papers, plaintiffs for the first time alleged a false advertising claim based on the National Geographic defendants' representation of the CNG as "an exact copy" of the Magazine.[92] Essentially, plaintiffs argue that the National Geographic defendants intentionally modified the image quality of the photographs to make them "fuzzy" and that they therefore have misrepresented an inherent characteristic of the product by calling the CNG an exact copy of the Magazine.

The evidence to which plaintiffs cite does not support their claim. There is nothing to suggest that any difference in the quality results from anything other than the process of transferring print images to digital form. In particular, there is nothing to suggest that the National Geographic defendants intentionally altered image quality to confuse customers, as plaintiffs suggest. Nor is there any evidence to support plaintiffs' allegations that the CNG is not literally an exact copy of the Magazine, even with the alleged difference in quality. The CNG contains all issues, including text and photographs, of the Magazine from 1888 to the present, with the exception of the aforementioned regional editions and 60 blacked-out images. The Court has reviewed the CNG. Any difference in quality resulting from the digitizing process is immaterial to the representation of the CNG as an exact copy of the Magazine and could not support a finding of a Lanham Act violation.

### Conclusion

For the foregoing reasons, defendants' motions for summary judgment dismissing the complaint [docket items 234 and 236] are granted to the extent that plaintiffs' Copyright and Lanham Act claims are dismissed on the merits except, in the case of the ProQuest defendants only, the copy-

---

89. Nat'l Basketball Assn. v. Motorola, Inc., 105 F.3d 841, 855 (2d Cir.1997) (internal quotations omitted).

90. Id.

91. Plaintiffs offer a survey by John A. Bunge which, they claim, demonstrates that customers felt misled by the blacking out of photographs. See Pl. Opp. NG Mem. 38. Defendants move to strike the expert report and underlying survey as untimely, arguing that it violates the Court's May 13, 2003 order in that the time to submit expert reports had passed and Mr. Bunge is not a rebuttal expert. See NG Mem. in Support of Motion to Strike 1–4. But the Court need not resolve this issue. There is nothing in the Bunge survey to demonstrate that the blacked-out photographs would have been material to a customer's decision to purchase the CNG. The survey's conclusion that 52.8 percent of respondents felt the title "Complete National Geographic" was misleading is itself misleading. Survey respondents were not told that only 60 of some 18,000 images were blacked out before forming such an opinion, but were led instead to believe that every article contained a blacked-out image. See Bunge Oct. June 18, 2003 Decl. ¶ 6 (survey respondents were shown Exhibit E, consisting of four articles, each containing a blacked-out image, and then asked whether they thought the title was misleading). Thus, even were the survey admissible, it would not support a finding that the blacking out of 60 images was material or misleading for purposes of the Lanham Act claim. Moreover, it is undisputed that none of images of the plaintiffs in this action was blacked out. See Fahey Decl. ¶ 28; NG 56.1 St. ¶ 38; Pl. Opp. NG 56.1 St. ¶ 38.

92. See Pl. Opp. NG Mem. 39.

right infringement claims are dismissed only to the extent that they are based upon the CNG, GPO and microform products.[93] Those motions are denied in all other respects without prejudice to renewal as to the state law claims, on the existing papers, following the Second Circuit decision in *Faulkner* and related cases. Plaintiffs' motion for partial summary judgment [docket item 245] is denied, also without prejudice to renewal, on the existing papers, as to the state law claims only following the Second Circuit decision in *Faulkner* and related cases. Defendants' motion to strike the expert designation and report of John A. Bunge [docket item 247] and the ProQuest defendants' motion to preclude evidence [docket item 139] are denied as moot.

SO ORDERED.

---

93. The qualification with respect to the copyright infringement claim is attributable to the fact that plaintiffs appear to allege infringement via reprints from the microform editions and, perhaps, other products, but neither side has fully identified, let alone addressed, whatever issues these matters present.